## THOMAS TAYLOR v. STATE.

No. A-9344. March 17, 1939.
(88 P. 2d 665.)

W. Shearer Brown and L. W. Randolph, both of Muskogee, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and A. Camp Bonds, Co. Atty, of Muskogee, for the State.

BAREFOOT, J. The defendant was charged by information in Muskogee county, with the crime of forgery in the second degree, was tried, convicted and sentenced to serve a term of 3 years in the penitentiary, and has appealed.

It is contended by defendant that the evidence presented by the state is insufficient to sustain a conviction, and that the evidence does not show that defendant had knowledge that the check in question was forged.

Defendant was charged with a violation of section 2125, Okla. Stats. 1931, Okla. St. Ann. title 21, sec. 1577, which provides as follows:

"Every person who sells, exchanges or delivers for any consideration any forged or counterfeited promissory note, check, bill, draft, or other evidence of debt, or engagement for the payment of money absolutely, or upon any contingency, knowing the same to be forged or counterfeited, with intent to have the same uttered or passed, or who offers any such note or other instrument for sale, exchange or delivery for any consideration, with the like knowledge and intent, or who receives any such note or other instrument upon a sale, exchange or delivery for any consideration with the like knowledge and intent, is guilty of forgery in the second degree."

The evidence revealed that defendant was a resident of Muskogee. That on the 25th day of May, 1936, he entered the Citizens National Bank of Muskogee, and presented to the cashier of said bank a check signed by "Nell Dashman," which was as follows:

"Tulsa, Okla., Apr. 30, 1936, No. —.

"The First National Bank and Trust Company pay to the Order of Wilbert Duncan $260.94 Two Hundred Sixty and 94/100_____Dollars.

"(Signed)   Nell Dashman"

Endorsed:

"Wilbert Duncan
"Abe Johnson
"Thomas Taylor

"Citizens National Bank
"Muskogee, Okla.

"Collection Account

"Endorsement Guaranteed May 25, 1936."

He was informed by the cashier of the bank that the same could not be handled as a cash item, but that it would be taken for collection. In a few days defendant returned to the bank, and was informed that no return had been had on the check, and he was asked to call back the next day. It was several days before he returned, and he was informed that the check had been paid, and he was asked if he desired the money, and he took $160.94 in cash, and deposited $100 in the bank. All of this money was withdrawn from the bank by defendant prior to his arrest. He had no account with the bank prior to this time. In a short while it was learned by the officers that the check in question was a forgery, and defendant was arrested.

The evidence further revealed that Nell Dashman, who signed the check, was teaching in a business college in the city of Tulsa, and resided at the Wells Hotel in that city. That on or about April 30, 1936, she had an account at the First National Bank & Trust Company in Tulsa; that on the 22d day of May, 1936, she signed a check in blank. Nothing was on it but her signature. She was intending to fill out the check, but the telephone rang

and she shoved the check under some papers, and when she returned the ink where she had signed her name was "smeared." In the hurry she did not destroy the check as she thought she had, and for this reason did not telephone the bank to stop payment on same. She carried an armful of papers to her room at the hotel, and when she had finished with them at night, threw them in the waste basket, and with them was the blank check. The maid at the hotel emptied the waste basket. That she did not see the check again until the 3d day of June, 1936, when she received her canceled checks from the bank. The check had been filled out as above shown. She knew no one by the name of Wilbert Duncan, the payee, nor Abe Johnson or Thomas Taylor, the indorsers on the check. That the check was a forgery with the exception that she signed the same as above indicated.

Ed Corbin, the chief of police of the city of Muskogee, testified that he arrested defendant and took him to the police station, and had a conversation with him in which defendant stated that he got the check in question from a man by the name of "Abe Johnson, down on Main street." That he had known Johnson for three or four months. That he had first met him on the streets of Muskogee, and that Johnson asked him to come and take a drink with him, and then asked him if he knew where he could get some whisky. That he went and got him two or three pints of whisky, and sold him a cow for $40, "and then sold him 25 gallons of whisky, and delivered it to him over near Fort Gibson, and Abe Johnson owed him about $120 for the whisky he had sold him, and he brought this check down here from Tulsa and gave it to him."

He further testified:

"A. He said Johnson had brought this check down here with him and wanted to pay him what he owed him; I have forgotten the amount he said Johnson owed him

but he said he gave Johnson $40 in money and sold him 25 gallons of whisky; I don't remember if the whisky was $3 a gallon or what it was but he said Abe gave him the check in payment for it. Q. Did you say that he said he had been loaning Johnson money at several times? A. Yes, sir, he said that and he said he sold him his cow. Q. The first statement he made at the police station did he say anything about the whisky transaction or was that a later statement that he made at his preliminary? A. That was a later statement. Q. Did he say anything at all about the whisky the first time you talked to him? A. No, sir. Q. Did he tell you about the cow he had sold to Johnson when he made the first statement? A. No, sir."

The chief of police further testified that at the time he talked to defendant he had procured the check from the bank and asked defendant to write all the names on the check, which defendant did. That defendant, in writing the name W-i-l-b-e-r-t, wrote it W-i-l-b-e-t, just like it was indorsed on the check, leaving out the letter "r." That at the time defendant wrote the names he had not been shown the check, and did not know that he had it. This witness further testified that defendant said the man Johnson was driving a Model A Ford coupe when he delivered him the whisky.

Defendant, testifying in his own behalf, said that he was 42 years of age. That he had never been convicted of any crime. That he became acquainted with Abe Johnson about the 1st of January, 1936. That he was arrested by the chief of police at his home when he was delivering a load of wood. With reference to the check, he testified:

"A. Well, they came out to the house and arrested me one evening; I was unloading wood when they came out there and I was just going to take an order of wood across the street and they arrested me and took me down to the police station, and he asked me about the check and he asked me if I had signed my name to the check and I said, 'Yes,' and I said, 'I signed it Thomas Taylor,'

and they asked me if I took the check to the bank and I told them I took the check to the bank and left it there; the other two names were already on the check and I didn't indorse it at first; the other two names, Wilbert Duncan and Abe Johnson, were already on the check and I handed the check through the window and then I said to the banker, 'Wait a minute and let me put my John Henry on it,' and I signed the check and gave it to him and he asked me when I was arrested how come me with the check and I didn't know whether to tell him I got it for whisky or not and I wanted to call my lawyer and he wouldn't let me and so I just told him I had sold him a cow and got the check. Q. As a matter of fact did you sell him a cow? A. No, sir. Q. Now, just explain to the jury how you got this check. A. Well I don't know Wilbert Duncan at all; I wouldn't know him if I would see him but I had been selling Abe Johnson whisky ever since the first of the year and I sold Abe Johnson five gallons of whisky and he gave me the check is how I got the check. Q. How much a gallon did you get for the whisky? A. Three dollars a gallon. Q. And you sold him 75 gallons at $3 a gallon, that made $225? A. Yes, sir. Q. How did you make up the difference? A. I gave him $35 for the difference. Q. What happened to the 94c? A. Well, he said he would just call that square. I had let him have whisky before and he had owed me for it and I had $35 and I gave that to him and he said, 'All right, we will just call it square'. Q. With reference to the day that you got the check, what day did you carry it to the Citizens National Bank? A. Well, I got the check from him one night and I kept it in my pocket about three days and then I took it to the bank and asked them to run it through and see if it was all right and he told me to come back day after tomorrow and I went back then and he said he hadn't heard anything from it and he said, 'We should hear tomorrow,' but I didn't go back until about a week and then when I went back he said we have got a letter on it and it is OK and he shoved the money out the window to me and I told him I didn't want all of it and I shoved a hundred dollars of it back and took the rest of it."

He further testified that he had tried to locate both Abe Johnson and Wilbert Duncan. That he had his law-

yer inform the county attorney where he had heard Wilbert Duncan was located.

On cross-examination defendant admitted his statement was false when he told the officer that he had sold Abe Johnson a cow, and that Abe Johnson had given him a note and mortgage. He testified that he owned a two-barrel still, and that he made whisky and sold it to Abe Johnson on several different occasions between January and May. That the last time he sold him 75 gallons and delivered it to him from a truck. That there were two barrels and a 10-gallon keg and a 5-gallon keg, and they were placed in the rumble seat of the car of Abe Johnson. His description of Abe Johnson was: "He is a pretty nice looking man about 30 years old, kind of boyish looking, and kind of short and dark." This was all the evidence offered by defendant.

It is first contended by defendant that the evidence revealed that the check in question was left with the Citizens National Bank of Muskogee for the purpose of collection, and the check was not sold to the bank, but that the bank was an agent of the defendant for the collection of the same. A number of cases are cited by defendant which hold:

"When a check or other commercial paper is deposited in a bank, endorsed for collection, or where there is a definite understanding that such is the purpose of the transaction at the time of deposit, there is no question that the title to the paper remains in the depositor. So, checks deposited as checks do not give rise to the relation of debtor and creditor and the title to them remains in the depositor, the bank merely acting as an agent for the depositor for the purpose of collection."

Among the cases cited are none involving criminal cases, nor construing a statute similar to the one under which defendant is being prosecuted. The rule announced in the cases cited have no application to criminal cases.

The authorities from this state, in construing the identical statute here involved, have held as stated in Wharton on Criminal Law, vol. 1, sec. 742:

"Uttering is offering a forged instrument knowing it to be such, whether such offer is accepted or not, with a representation by words or action that it is genuine, with an intent to defraud; and it is a public offense. While the making of a forged instrument and the uttering of it by the same person as one transaction constitute but one offense, one may be guilty of uttering an instrument forged by another; but to constitute the offense it is essential that the person uttering the forged instrument have actual knowledge of its falsity. It is not sufficient that a person uttering an instrument has reasonable cause to believe it was forged." Wells v. Territory, 1 Okla. Cr. 469, 98 P. 483; Wilborn v. State, 26 Okla. Cr. 437, 224 P. 214; Ausmus v. State, 43 Okla. Cr. 66, 277 P. 259; Guess v. State, 53 Okla. Cr. 301, 11 P. 2d 199; Hill v. State, 24 Okla. Cr. 52, 215 P. 1077.

The question of guilty knowledge, and whether there was an intent to defraud, are questions for the jury to decide under the circumstances. And the proof of this fact may be made by circumstantial, as well as direct, testimony. Dilbeck v. State, 43 Okla. Cr. 42, 277 P. 284; Wells v. Territory, supra; State v. Peeples, 71 Wash. 451, 129 P. 108.

There is a distinction between obtaining money under false pretense and the charge of forgery. When a false pretense is charged, it is necssary to show the receipt of something of value directly attributable to the false pretense; but under the forgery statute, if any fraudulent advantage accrues to the accused, or any injury is suffered by the person imposed upon, it is sufficient. It is not even necessary to prove that money or property was obtained thereby. Wilborn v. State, supra; Cornelius v. State, 27 Okla. Cr. 331, 227 P. 845; State v. Hobl, 108 Kan. 261, 194 P. 921.

The fact that defendant deposited the check in the bank, and was told by the cashier that the same would be taken for collection, did not take away the criminal intent, if defendant knew at the time it was a forged check, and the delivery of the same to the bank was for the purpose of cheating and defrauding the person whose name was signed to the check. While it is true that the mere presentation of a forged instrument for payment does not raise a prima facie presumption of guilty knowledge of its falsity, it is a circumstance which, taken together with all the other facts and circumstances in the case, presents a question of fact for the jury to decide as to whether or not defendant knew at the time of presenting the same for payment that it was a forged instrument.

The jury had the right to consider the different stories told by defendant in reference to procuring the check. The sale of the cow, which he afterwards denied. The taking of the note and mortgage, which was also denied. His saying at one time he sold 25 gallons of whisky, and again that he sold 75 gallons of whisky. The fact that when called upon by the officer to write the name "Wilbert," that he left out the letter "r," just as it was left out when it was endorsed on the back of the check. The fact that neither Wilbert Duncan nor Abe Johnson could be located by the officers, were all facts to be considered by the jury.

The instructions fully covered the law of the case. No exceptions were taken by defendant, and no requested instructions were asked.

From a review of this record, we are of the opinion that no error was committed, and that the judgment of the district court of Muskogee county should be affirmed.

DOYLE, P. J., and DAVENPORT, J., concur.